UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| BRUJO FINANCE COMPANY, | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | C.A. No. _____ |
| | § | Admiralty 9(H)) |
| 100,266.35 BARRELS OF RON95 | § | |
| GASOLINE, in rem | § | |
| | § | |
| *Defendant*. | § | |

## VERIFIED COMPLAINT

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW Plaintiff, Brujo Finance Company ("Owners"), and files its Verified Complaint against 100,266.35 barrels of RON95 gasoline cargo (the "Cargo"), *in rem*, which Cargo presently is being carried onboard the *M/V ALKIMOS* (the "Vessel"), and would respectfully show as follows:

## JURISDICTION

1.     This Court has admiralty jurisdiction under 28 U.S.C. § 1333 and Rule C of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions of the Federal Rules of Civil Procedure (the "Supplemental Rules").  This is an admiralty and maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure.

## PARTIES AND SERVICE OF SUMMONS

2.     Plaintiff Owners are an entity organized under the laws of the Marshall Islands with a principal place of business located at Trust Company Annex, Ajeltake Road, Ajeltake Island, Majuro MH96960, Marshall Islands, and are engaged in the business of operating the Vessel in the carriage of liquid cargoes globally.

3.     Defendant Cargo, *in rem*, is a cargo of 100,266.35 barrels of RON95 gasoline currently being carried onboard the Vessel as reflected by a true and correct copy of the Bill of Lading annexed as **Exhibit 1**.  The Court has jurisdiction over the Cargo *in rem* as the Cargo is or will be in the jurisdiction of the District during the pendency of this action.

## FACTS

4.     On or about March 27, 2020, Sea Energy Company ("Charterers") entered into a voyage charterparty with Owners for the chartering of the Vessel – a Handysize tanker of approximately 14,000 dwt – on the ASBATANKVOY Form, as amended by the parties (the "Charter").  A true and correct copy of the Charter's fixture recap message from the brokers who fixed the Charter between the Owners and Charterers is annexed as **Exhibit 2**.  A true and correct copy of the ASBATANKVOY Form agreed between Owners and Charterers as the underlying voyage charterparty form is annexed as **Exhibit 3**.

5.     The Charter contemplated Charterers providing full cargoes of gasoline to the Vessel for two separate voyages in direct continuation from one port in Cristobal, Panama to one port in Curacao or Aruba.  As is common with liquid cargoes, the Charter also provided an option for discharge to be effected by ship-to-ship ("STS") transfer rather than discharge to a land-based terminal.

2

6.      As part of the Charter negotiations, Owners included in the Charter a "Sanctions

Clause," which provided as follows:

> Any trade which the vessel is employed under this charterparty which **could
> expose** the vessel, its owners, managers, crew or insurers **to a risk of sanctions**
> imposed by the United States, or the EU, shall be deemed unlawful and owners
> shall be entitled, at their **absolute discretion**, to refuse to carry out that trade.  In
> the event that such risk arises in relation to a voyage the vessel is performing, **the
> owners shall be entitled to refuse further performance** and the charterers shall
> be obliged to provide alternative voyage orders.

Charter, Sanctions Clause (emphasis added).

7.      The Vessel arrived at the loadport in Panama at March 29, 2020 and provided its

Notice of Readiness for loading to Charterers.  While the Vessel was waiting to load at Panama,

Charterers advised Owners that the Vessel would be performing STS discharge of the Cargo off

Aruba.  The details of that operation, however, were not immediately provided by Charterers.

8.      On March 31, 2020, while still awaiting details of the Charterers' STS operation,

Owners wrote to Charterers through brokers and advised as follows:

> . . . . Owners understand that [Charterers'] intention is to transship the cargo at
> Aruba by s-t-s.  That is not what Owners were advised when fixing.  The intention
> was always to discharge the cargo at Curacao.  At the last minute Charterers
> asked for an option of Aruba.  In good faith this was given.
>
> ***Just to be clear in advance.  Owners WILL NOT participate in any illegal
> trading.  If the intention is to transship the cargo s-t-s to move it to Venezuela
> same will not be done.  Any vessel nominated for transshipment will be subject
> to strict anti-sanctions scrutiny.***

A true and correct copy of Owners' e-mail dated March 31, 2020 is annexed as **Exhibit 4**

(emphasis added).

9. On April 2 and again on April 3, 2020, having not received definitive voyage orders, Owners contacted Charterers through brokers seeking definite voyage orders.

10. On April 3, 2020, Charterers did not provide definitive voyage instructions but stated that the STS operation would take place approximately 12 miles off Aruba to be confirmed after the Vessel's loading was completed.

11. While Owners awaited Charterers' specific instructions as to the proposed STS operation, Owners inquired with their agents in Aruba and were advised that specific at-sea coordinates were designated by the Aruban authorities for STS operations.

12. The Vessel commenced loading on April 7, 2020. Actual loading took approximately 24 hours. As a result of the delays experienced at the loadport, the laytime allowed for the Vessel under the Charter was completely consumed and substantial demurrage charges were incurred. A true and correct copy of Owners' "Tanker Time Sheet" to Charterers setting forth the time incurred at the loadport and reflecting accrued demurrage charges of $115,033.33 is annexed as **Exhibit 5**.

13. On April 8, 2020, as part of their due diligence efforts, Owners once again requested the details of the receiving vessel in the STS operation, including the last several port clearances for the proposed receiving vessel.

14. The Vessel departed the loadport on April 9, 2020 and sailed for Aruba for orders. That same day, Charterers provided through brokers details regarding the receiving vessel, the *M/V BEAUTY ONE*. One of the documents provided by Charterers was a document which purported to be a newly-entered charterparty for the *M/V BEAUTY ONE*. A true and correct copy of the purported *M/V BEAUTY ONE* charterparty is annexed as **Exhibit 6**. Charterers also

provided a rendezvous point for the STS operation, which location was situated in open seas rather than the designated Aruban STS operations area.

15.     Later that same day, Owners responded to Charterers' STS instructions and voiced a number of concerns:

      a.    Owners referenced the Charter's Sanctions Clause and that Owners had requested details concerning the STS operation for days without having received information from the Charterers.  Charterers only had provided details to Owners the afternoon before the Easter holiday weekend commenced.

      b.    The payment for the Vessel's freight charges was not paid by Charterers, but instead by a company named "Ultra Travel" purportedly from Montenegro. Owners requested that Charterers explain their relationship to Ultra Travel and why a third-party was paying the freight for the voyage.

      c.    The STS operation proposed was not in the designated Aruban STS operations area, but rather 50 miles west of Aruba (and off the northern coastline of Venezuela).  Owners refused to participate in the proposed STS operation as it was not within the range proposed by the Charter (i.e., Aruba).  Owners requested that Charterers provide a discharge location agreed to in the Charter.

      d.    The STS company specified by Charterers could not be found by Owners. Owners requested that Charterers confirm that the STS company was authorized to perform an Aruban STS operation.

5

    e.   Owners referenced the time charter for the *M/V BEAUTY ONE*, stating that "*the role and relationship of the said alleged time charterers to this whole operation must be explained in detail.  After that further, sanctions related information may be sought.*"

    f.   Owners further referenced the *M/V BEAUTY ONE* and demanded the last port clearance of the *M/V BEAUTY ONE*, founding this inquiry as follows:  "*From a review done by our operations department this vessel [the M/V BEAUTY ONE] has been trading the past 12 months coast wise in Venezuela?  Please ask Charterers to clarify if a permit from OFAC has been obtained by the Owners for such trading and if so to provide a copy of same.*"

A true and correct copy of Owners' e-mail dated April 9, 2020 is annexed as **Exhibit 7**.

    16.   After much back-and-forth between Owners and Charterers, Charterers agreed to perform the STS operation in Aruban waters.  Yet Owners' concerns regarding the *M/V BEAUTY ONE* remained.

    17.   As mentioned in part above, Owners' concerns regarding the Charterers' designation of the *M/V BEAUTY ONE* as the receiving vessel in the STS operation were numerous:

    a.   First, the *M/V BEAUTY ONE*, at approximately 49,000 dwt, is a vessel more than three times carrying capacity than the Vessel.  While larger vessels on occasion will discharge their cargo to smaller vessels at or near a discharge port in order to, for example, enable the cargo to be delivered to a discharge

location which might be situated in water too shallow for the larger vessel, transferring from a smaller vessel to a larger vessel is less common.

b.  Second, the Charterers told Owners that the ultimate destination of the Cargo would be Saint Eustatius after the Cargo had been transhipped to the *M/V BEAUTY ONE*.  On its face, this did not appear make economic sense, as Charterers apparently were chartering two vessels to perform the carriage of the Cargo – including a larger (and presumably more expensive vessel in the *M/V BEAUTY ONE*) – where the Vessel could have performed the voyage by itself (and Owners indeed offered the Vessel to perform carriage of the Cargo to Saint Eustatius).

c.  Third, and most troubling, as mentioned above Owners ascertained that the *M/V BEAUTY ONE* had been engaged in coastwise Venezuela trading (i.e., sailing in Venezuelan coastal trade) for the past year.  Having checked on-line tracking systems, they revealed that the last port of clearance for the *M/V BEAUTY ONE* prior to arriving at Aruba was in Venezuela.

18.     On April 12, 2020, because the facts surrounding the proposed STS transfer to the *M/V BEAUTY ONE* raised Owners' concerns that Charterers' intended destination for the Cargo was Venezuela, and therefore that Owners would be an accomplice to such an operation, Owners wrote to Charterers and requested adequate assurances from Charterers that Charterers' intended trade did not violate the Sanctions Clause.  A true and correct copy of the Owners' e-mail demand for adequate assurances dated April 12, 2020 is annexed as **Exhibit 8**.

19.     As that day progressed, Charterers responded initially by protesting against needing to provide any information.  Later in the day, however, Charterers referred to documents that Charterers had provided a few days earlier, including a document which purported to be a newly-entered charterparty for the *M/V BEAUTY ONE* (see **Exhibit 6**).

20.     As can be seen from the Vessel's Charter annexed as **Exhibit 2**, many charterparties do not get reduced to a full contract but rather are based on the broker's fixture recap message.  While there frequently are charterparties which never are officially executed, there virtually always is a fixture recap message memorializing the charterparty.

21.     When Charterers provided a purported charterparty to Owners for the *M/V BEAUTY ONE* that was signed by the *M/V BEAUTY ONE*'s charterer but not by the vessel's owner, this purported charterparty proved nothing.  Therefore, later on April 12, 2020, Owners requested that Charterers provide the fixture recap from the broker that should have been issued mere days earlier:

> With reference to our previous message earlier today requesting details of the parties, transactions, and BEAUTY ONE c/p related to the cargo aboard the ALKIMOS and the STS operation which you now have requested, we are disappointed that Charterers are unable – or unwilling – to provide Owners with any assurances with regard to Owners' concerns that the cargo may in fact be destined to Venezuela in violation of US sanctions.  The advice by the BEAUTY ONE to the Harbour Master that the next port of call for the BEAUTY ONE now is Trinidad hardly gives us comfort – Trinidad is a known location for transshipment of suspect Venezuelan cargoes.
>
> ***Charterers have not materially responded to Owners' requests for information, but rather have merely replied – essentially – by saying "trust us."  This is insufficient.  The one document of any substance provided so far in response to any of Owners' requests is a document purporting to be the BEAUTY ONE c/p – but unsigned by that vessel's owners.  We would expect that Charterers would***

8

*have sent a fixture recap in such circumstances to verify the authenticity of the c/p, but we have not seen the fixture recap.*

Given Charterers' refusal to provide Owners with the requested adequate assurances that Charterers' plans for the cargo do not violate US sanctions involving Venezuela (despite a number of indicia that those plans in fact suggest the opposite), Owners view Charterers as being in breach of the Charter's Sanctions Clause. As per the Sanctions Clause, Owners have the absolute discretion to make such a decision. Accordingly, Owners are refusing further performance under the Charter – specifically going forward with the proposed BEAUTY ONE STS operation – and demand that Charterers provide alternative voyage instructions. **Although Owners are holding Charterers in breach of the Sanctions Clause for Charterers' failure to provide the adequate assurances demanded by Owners, Owners are willing to allow Charterers to rehabilitate their performance under the Charter but only if Charterers respond in substance to Owners' previously conveyed adequate assurance demands, specifically**:

(a) Please confirm the origin of the cargo and provide documentation showing the shipper's purchase/procurement of the cargo. While you have provided a document purporting to show the origin of the cargo, you have provided us nothing with respect to underlying documentation (sales contract, invoice, etc.) to prove that this representation as to the cargo's origin is supported by underlying documentation.

(b) Please provide documentation showing the identity of the beneficial owners of the Charterers.

(c) Please provide documentation regarding the BEAUTY ONE's onward destination, including any declarations made to authorities at destination about upcoming discharge of the cargo. While we understand that the next port of call is now Trinidad – another change in the expected itinerary of the BEAUTY ONE – Owners have received nothing with respect to whether the Trinidad call will be for discharging to a shore-based facility or to yet another vessel for ultimate delivery to Venezuela. This is critical for Owners – as responsible shipowners – to lock down so as to avoid subsequently being designated (themselves and/or their vessel) as a Specially Designated National by the US Treasury Department's Office of Foreign Assets Control. *Additionally, as mentioned above, we will*

9

*require the fixture recap for the BEAUTY ONE fixture so that we may verify that the unsigned c/p forwarded by you reflects the actual fixture.*

(d) The identity and beneficial owner of the ultimate consignee/buyer of the cargo.  There is no information on the file as to the identity of the beneficial owner of the consignee and the consignee's own lawyers have refused to disclose their client's identity.  This hardly is complying with Owners' request.

As previously advised, Owners are open to Charterers instructing Owners to take the cargo on the ALKIMOS to Trinidad (or any alternative disport which would not implicate US or EU sanctions).

Assuming that Charterers fail to respond to Owners' adequate assurance demands with any substance, Owners look forward to receiving the above-requested alternative voyage instructions from Charterers as a matter of urgency.

A true and correct copy of Owners' e-mail dated April 12, 2020 is annexed as **Exhibit 9** (underlined emphasis in original).

22.     The very next morning, the *M/V BEAUTY ONE* departed Aruban waters and abandoned any STS operation.  By using on-line tracking systems available to monitor vessel traffic, Owners were able to monitor the *M/V BEAUTY ONE*'s voyage progress – to Venezuela.  The *M/V BEAUTY ONE* returned to Venezuelan waters immediately after departing Aruba.  The same tracking service shows the *M/V BEAUTY ONE*'s recent movements since the aborted STS operation all have been within Venezuelan waters.  A true and correct copy of the Sea-web report for the *M/V BEAUTY ONE*'s recent activities is annexed as **Exhibit 10**.

23.     On April 13, 2020, after the *M/V BEAUTY ONE* fled Aruban waters on its return to Venezuela, and as a result of Charterers' failure to provide adequate assurances that the trade they intended was not one which could expose Owners to US sanctions, Owners demanded that

10

Charterers provide the Vessel with alternative voyage orders pursuant to the Sanctions Clause.

After recapping the series of events that had led to the current situation, Owners' lawyers stated:

> At this juncture, Owners officially provide Charterers notice that Owners hold Charterers in breach of the Sanctions Clause.  Your revised voyage directions – which seek to have Owners complete an offshore transfer of cargo to a vessel known to be conducting Venezuelan trade just outside Venezuelan waters – clearly **could** expose Owners to a **risk** of sanctions.  The Sanctions Clause does not require certainty with respect to the imposition of sanctions.  Here, the risk clearly exists.  As a result, Owners have the absolute discretion to demand revised voyage instructions.  Charterers agreed to these terms when they fixed the Vessel.  Owners now are relying on this agreed term to demand that Charterers provide revised voyage instructions.

> We understand that you have told Owners that they can investigate the background circumstances of the cargo transactions, etc. by contacting Charterers' customer ES Euroshipping AG.  You have also suggested that Owners contact Mr. John Brennan for purposes of OFAC inquiries.  You seem to misunderstand the status of these communications.  Owners have requested that Charterers provide assurances to Owners.  Charterers' obligation in such circumstances is to respond with responsive materials or risk Owners declaring Charterers in breach.  Charterers have not provided Owners with anything responsive despite Owners' repeated requests for such assurances.  Owners have no obligation to pursue these issues with Charterers' customer.  Furthermore, our firm has substantial contacts with OFAC and provides advice on these issues routinely.

> ***We demand on Owners' behalf that Charterers provide Owners with alternative voyage instructions promptly, and not more than 72 hours from the time that message is transmitted.  All time incurred as a result of these delays will be for Charterers' account, <u>for which claim Owners reserve the right to exercise their lien on the cargo should such action become necessary</u>.  If Charterers fail to provide alternative voyage instructions within the next 72 hours, Owners reserve their right to act further to protect their interests in any manner permitted by law.***

11

A true and correct copy of Owners' e-mail dated April 13, 2020 is annexed as **Exhibit 11** (emphasis added).

24.     Despite Owners' demand for alternative voyage orders, the 72 hour deadline expired – at the latest – in the early morning on April 17 (NYC time).  While written and telephonic communications took place between Owners and Charterers as well as Owners and the Cargo's consignee during this period, Charterers did not provide Owners with firm voyage instructions prior to this deadline.  During this time period, on April 15, 2020, Owners issued an arbitration demand to Charterers and appointed Sandra Gluck, Esq. as Owners' arbitrator.  A true and correct copy of Owners' arbitration demand dated April 15, 2020 is annexed as **Exhibit 12**.

25.     Despite the Charterers' failure to comply with the first deadline, four days after the first deadline Owners gave Charterers a second chance to comply with their obligations on the morning of April 21 (at approximately 3 am NYC time) by demanding voyage orders by 5 pm NYC time on April 22:

> As previously advised, we are counsel for the Owners of the M/T ALKIMOS (the "Vessel") in the referenced matter relating to the voyage charter dated 27 March 2020 between Owners and Sea Energy Company ("Charterers").
>
> As you recall, Owners demanded that Charterers provide to Owners alternative voyage instructions.  This was because Charterers' initial voyage orders raised concerns – in response to which concerns Charterers failed to provide the requested adequate assurances – that Owners completion of the proposed voyage orders could expose Owners to the risk of sanctions.  As of today, Owners have not received from Charterers alternative voyage orders for the Vessel.  While Owners have received correspondence from lawyers for the consignee that the cargo has been sold to another party, Owners have not received official alternative voyage instructions from Charterers.  As a result, the Vessel remains at Aruba awaiting new voyage orders incurring demurrage, all of which time is for Charterers account.

12

> Owners hereby demand that Charterers provide alternative voyage orders to the Vessel NLT 5 pm New York time on Wednesday, April 22, 2020.  Should Owners not receive alternative voyage instructions by 5 pm New York time on Wednesday, April 22, 2020, ***Owners will hold Charterers in breach of the Charter with respect to providing Owners with a discharge port under the Charter.***
>
> All time incurred as a result of these delays will be for Charterers' account, ***for which claim Owners reserve the right to exercise their lien on the cargo should such action become necessary.  If Charterers fail to provide alternative voyage instructions as requested, Owners reserve their right to act further to protect their interests in any manner permitted by law.***

A true and correct copy of Owners' e-mail dated April 21, 2020 is annexed as **Exhibit 13** (emphasis added).

26.     This gave Charterers a second chance window of 38 hours to comply with their obligations under the Charter, while warning Charterers that a failure to designate an alternative discharge port would be treated by Owners as a breach of the Charter.  Charterers once again failed to comply with this deadline.  Rather, Charterers sought to have Owners agree to change the Charter from a voyage charter (i.e., procuring use of the Vessel for a voyage from a loadport to a discharge port) to a time charter (i.e., procuring use of the Vessel for a designated period of time).  In light of skyrocketing market conditions, Charterers' proposal made no economic sense to Owners and was rejected by Owners on April 23, 2020.  Furthermore, Owners declared Charterers in breach of their obligation to provide definitive alternative voyage orders and alerted Charterers of Owners' intention to exercise Owners' lien on the Cargo unless Charterers offered consideration sufficient to induce Owners to re-commit to the breached Charter:

> Owners agreed to voyage charter the Vessel to Charterers for two voyages which were to encompass a time period that should have been expiring about now. Charterers' initial discharge orders for the current cargo could have exposed the

Owner to sanctions.  Under the Sanctions Clause in the Charter, Owners were entitled to demand that "the Charterers shall be obliged to provide alternative VOYAGE orders."

Charterers have now proposed converting the Charter to a time charter as their purported revised "voyage" orders.  Owners reject this attempt to fundamentally change the nature of the Vessel's Charter.  Owners did not agree to a time charter when the Vessel was fixed.  Owners do not wish to fix the Vessel to Charterers in a time charter now.  What Charterers propose would be a novation of the Charter, and Owners reject Charterers' proposal.

While Owners sympathize with any storage issues that Charterers may be encountering, that is a challenge which is Charterers' issue rather than Owners' issue.  As Charterers no doubt are aware, the tanker market has risen tremendously recently in light of current world events.  ***Owners have an obligation to mitigate their potential losses under the Charter rather than continue to allow demurrage to accrue.  The best way to do so is to discharge the cargo and employ the Vessel.  <u>Owners also possess a lien on the cargo for pending freight, demurrage, expenses and attorneys' fees</u>.  Accordingly, as Charterers have failed to provide Owners with alternative discharge instructions as demanded by Owners under the Sanctions Clause, <u>Owners will find a location to discharge and/or sell the cargo to enforce Owners' lien on the cargo</u>.***  Should the sale of the cargo fail to make Owners whole, Owners reserve the right to proceed against Charterers in personam to recover the balance of Owners' claims.

Charterers may avoid Owners' moving forward on the actions described in the preceding paragraph by (1) providing definite VOYAGE orders directing the Vessel to a discharge port within the Charter's original range (or reasonably nearby for an agreed reasonable uplift in freight), and (2) providing $700,000 in security for Owners' claims for expected freight ($270,000 anticipating potential alternative local disports), demurrage (approximately $285,000 through 0800 24 April 2020 plus 7 days further anticipated time at $100,000 total), and attorneys' fees ($45,000), to be deposited in escrow in the trust account of Holland & Knight LLP (details to be provided assuming Charterers agree to provide security) pending completion of the voyage and settlement of Owners' claims.  ***<u>Unless and until Charterers take the foregoing actions, however, Owners today will move forward in ascertaining potential discharge/sale locations for the cargo and will direct the Vessel to proceed to the best location once identified.</u>***

14

A true and correct copy of Owners' e-mail dated April 23, 2020 is annexed as **Exhibit 14** (emphasis added).

27.     Charterers did not comply with Owners' April 23 invitation to re-commit to the Charter.   Rather, Charterers sought to negotiate with Owners over the next two and a half days as to the pricing on the first voyage as well as seeking to avoid the second voyage.   On the afternoon of April 25, Owners provided terms to Charterers upon which Owners would carry the cargo to Charterers' proposed discharge location of Trinidad.   After setting forth Owners' terms to agree to such a voyage, Owners stated:

> If no agreement is reached by midnight tonight, ___*the vessel will proceed to a port convenient for the liening of the cargo.  Arbitration has been commenced.  The Charterers can present their case both at the port chosen for lien and in the Arbitration.*___   If Charterers think that Owners are in the wrong they will have ample chance to explain their position and make their claim against the Owners.

A true and correct copy of Owners' e-mail dated April 25, 2020 is annexed as **Exhibit 15** (emphasis added).

28.     The next day, Charterers having accepted a portion of Owners' offer but failed to address Owners' concerns as to the location of the Cargo's Bills of Lading, Owners advised Charterers that they were sailing the Vessel to the US Gulf:

> Owners feel that Charterers either do not understand Owners' position or want to ignore it.  Owners were expecting a detailed response regarding Bills of Lading and the delivery of the cargo.  Still nothing on same, which indicates it is an issue they (the Charterers) do not wish to touch on.
>
> ___*The vessel will sail for US Gulf.*___   Charterers' lawyers are free of course to talk to Owners' lawyers.  Bot [*sic*] to be clear not only the delay up to when and if any agreement is reached will continue to be charged (and at the default daily rate as per Owners' demand) but any deviation back to the destination requested.

15

Also just to clarify, there is no such thing as payment after discharge for any of the items. If Charterers wish the funds for 2nd voyage can be deposited with lawyers Holland and Knight to be released after discharge but that is all.

Trust the above is clear.

A true and correct copy of Owners' e-mail dated April 26, 2020 is annexed as **Exhibit 16** (emphasis added).

29.     Following this correspondence, the Cargo's consignee's lawyers contacted Owners' lawyers in an attempt to resolve the parties' differences, but those efforts failed.

30.     Following this sequence of events, during which time Owners repeatedly warned Charterers that Owners would exercise their right to lien the Cargo in the event that Charterers did not live up to their obligations under the Charter, Charterers retained counsel in Aruba and wrote to local authorities accusing Owners of being "guilty of theft and/or embezzlement of the Cargo . . . ." A true and correct copy of Charterers' counsel's April 28, 2020 letter to the Aruban authorities is annexed as **Exhibit 17**.

31.     Shortly after Owners' counsel received a copy of Charterers' Aruban counsel's letter, Owners sent the following correspondence to Charterers notifying Charterers of Owners' intent to arrest the Cargo in Houston:

Owners refer to their message sent to Charterers at 2:44 pm New York time on Saturday, April 25.

Despite requesting alternative voyage instructions repeatedly from Charterers, Charterers failed to provide such orders from April 13 through April 22.  At that juncture, Owners accepted Charterers' repudiation of the Charter through Charterers' multiple breaches after Owners twice had provided deadlines by which they required Charterers  to provide voyage instructions.  After these two failures to comply, and a collective 9 days of delay after the time when Owners demanded alternative voyage orders, Owners wrote to Charterers and advised that

16

Owners would act to exercise their lien unless Charterers met Owners' demand to mitigate Owners' damages.

After April 22, Owners no longer were obliged to comply with the Charter as Charterers had terminated the Charter through their breaches. Nevertheless, Owners remained open to trying to resolve this dispute. At this juncture, however, Owners requested that Charterers (1) provide Owners payment to mitigate Owners' damages and (2) provide specific details with respect to the cargo's Bills of Lading. Charterers never met these demands.

As a consequence of the foregoing, Owners have opted to protect their rights and exercise their lien over the cargo. Owners have ordered the Vessel to sail to Houston, with the Vessel expected to arrive on May 2. Unless Charterers provide security to Owners for the Owners' claims, Owners will seek the following relief from the Houston court: (1) an order from the Houston court to arrest the cargo, (2) an order from the Houston court to have the cargo transferred to the custody of an substitute custodian, and (3) an interlocutory order from the court to sell the cargo at auction as soon as possible for the purpose of obtaining security for Owners' claims.

Owners urge Charterers to arrange for security so as to avoid Owners having to sell the cargo.

A true and correct copy of Owners' e-mail dated April 29, 2020 is annexed as **Exhibit 18** (emphasis added).

32.     Part II, Clause 24 of the ASBATANKVOY Form incorporated into the Charter provides "[a]ny and all differences and disputes of whatsoever nature arising out of this Charter" shall be arbitrated in New York. In this proceeding, Owners seek to exercise their lien on the Cargo as agreed between Owners and Charterers and as provided in the Charter, and to secure Owners' claims against Charterers in New York arbitration which Owners already have commenced.

17

## MARITIME LIEN

33.     The Charter incorporated the ASBATANKVOY Form, which is a standard voyage charter form in the industry for the chartering of liquid cargoes.  That Form gives a vessel owner the explicit right[1] to lien cargo carried by the vessel for, *inter alia*, freight, demurrage, and attorneys' fees, all of which are owing in this case.  That lien is found in Part II, Clause 21 of the ASBATANKVOY Form, which provides:

> 21.     LIEN.  The Owner shall have an absolute lien on the cargo for all freight, deadfreight, demurrage and costs, including attorney fees, of recovering the same, which lien shall continue after delivery of the cargo into the possession of the Charterer, or of the holders of any Bills of Lading covering the same or of any storageman.

Charter, ASBATANKVOY Form, Part II, Clause 21.

34.     As described above, the Vessel incurred demurrage in the amount of $115,033.33 at the loadport, which demurrage charges have not been paid.  (See **Exhibit 5**).

35.     As described above, the Vessel incurred a further time delay of over 15 days at Aruba in the amount of $383,750.00.  A true and correct copy of Owners' invoice to Charterers for the Aruba delays is annexed as **Exhibit 19**.

---

[1] For the Court's guidance, while the ASBATANKVOY Form provides an explicit contractual provision relating to a shipowner's right to lien cargo carried by the vessel for carrying charges such as freight, deadfreight, and demurrage, such a lien exists under the US general maritime law even in the absence of such contractual language.  *See*, *e.g.*, *The BIRD OF PARADISE*, 72 U.S. 545, 554-55 (1866) (reciting accepted rule that shipowner has maritime lien against its cargo for unpaid freight); *Marquette Transp. Co. v. A Cargo of Sand, Etc.*, Civ. A. H-15-494, 2015 WL 7313416, at *6-7 (S.D. Tex. Nov. 19. 2015) (granting carrier's summary judgment motion finding maritime lien against cargo for carrier's freight and demurrage claims).

18

36.     The Vessel further has incurred time delays expected to total $144,583.33 during its voyage from Aruba to Houston, as well as bunker consumption expenses in the amount of $42,551.83.   A true and correct copy of Owners' calculations for time incurred during the Vessel's voyage from Aruba to Houston is annexed as **Exhibit 20**.

37.     Owners also expect to incur further expenses in the estimated amount of $50,000.00 related to the care and custody of the Cargo pending this Court's auction of the Cargo.

38.     Owners have also incurred attorneys' fees to date in the approximate amount of $60,000.00 and expect to incur a total of $1,000,000.00 in attorneys' fees collectively in prosecuting this maritime lien action and prosecuting Owners' claims in New York arbitration against Charterers.

39.     Owners have performed all conditions precedent to warrant full and complete payment for the charges claimed under the Charter.

40.     As a result of the foregoing, Owners possess a maritime lien on the Cargo for the carriage of the Cargo as described above in an amount in excess of $1,735,918.49, plus interest and costs, which maritime lien is enforceable in admiralty in accordance with the provisions of Rule C of the Supplemental Rules.

## **PRAYER FOR RELIEF**

Wherefore, premises Considered, Plaintiff Owners pray that this Honorable Court enter judgment as follows:

1.      That process in due form of law according to the practice of this Court in the form of a Warrant of Arrest be issued against the Defendant Cargo in the amount of $1,735,918.49, plus interest and costs;

2.      That any party claiming an interest in the Cargo may be cited to appear and answer the matters aforesaid;

3.      That should no party appear to claim and provide security to release the Cargo, that this Court issue an order to sell the Cargo;

4.      That this Court recognize and confirm any arbitration award(s) rendered on the claims set forth herein as a Judgment of this Court, along with awarding Plaintiff's attorney's fees and costs in connection with these actions;

5.      That this Court retain jurisdiction over this matter through the entry of any judgment or award associated with any of the claims currently pending, or which may be initiated in the future, including any appeals thereof; and

6.      That this Court grant Plaintiff such other and further relief which it may deem just and proper.

Date:   May 1, 2020

Respectfully Submitted,

**HOLLAND & KNIGHT LLP**

*/s/ Julia M. Haines*
Julia M. Haines
State Bar No. 08710800
Fed ID No. 00765
1100 Louisiana Street, Suite 4300
Houston, Texas 77002
Julia.Haines@hklaw.com
***Attorneys for Plaintiff Brujo Finance Co.***

20

STATE OF TEXAS §
§
COUNT OF HARRIS §

## **VERIFICATION**

1.      I am a member of the law firm Holland & Knight LLP, counsel for the Plaintiff.

2.      The facts alleged in the foregoing Complaint are true and correct based upon my information and belief.  The basis of my information and belief is the information from Plaintiff, Brujo Finance Company, from documents in the files of Holland & Knight LLP, and from reviewing various documents and materials provided by Plaintiff.

3.      The authorized officers of Plaintiff are not readily available in this District to make verifications on Plaintiff's behalf.  I am authorized to make this Verification on Plaintiffs' behalf.

4.      Pursuant to Rule C of the Supplemental Rules, I verify that the facts alleged in the foregoing Verified Complaint are true and correct.

_____
Julia M. Haines

SWORN TO AND SUBSCRIBED TO BEFORE ME under my hand and official seal of office this 1st day of May, 2020.



LATONYA MCPHERSON
My Notary ID # 129374087
Expires April 3, 2021

_____
Notary Public, State of Texas

21

#74462243_v1